[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
On March 23, 1988, the Commissioner of the Department of Children and Youth Services (DCYS) filed a Petition For Termination of Parental Rights in this Court, seeking to terminate the parental rights of Patricia and Carl M. in their then two-and-a-half year old daughter Shana M.[1] Jurisdiction is properly invoked pursuant to Conn. Gen. Stat. 17-43a(a),[2] the child in question having previously been committed to DCYS in accordance with 46b-129. As to the father, the petition alleges that the child has been abandoned by him in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to her welfare. See 17-43a(b)(1). As to the mother, the petition alleges that (1) the child has been denied by reason of act or acts of commission or omission, the care, guidance or control necessary for her physical, educational, moral or emotional well-being, see 17-43a(b)(3); and (2) there is no ongoing parent-child relationship as defined by law, see 17-43a(b)(4). All of these grounds are alleged to have existed for a period of time in excess of one year. The Petition is accompanied by a statement of detailed factual allegations. It was amended on May 29, 1990 by the addition of further factual allegations. The adjudicatory phase of this case is consequently limited to events preceding this latter date. See In re Juvenile Appeal (84-AB),192 Conn. 254, 267-68 n. 14, 471 A.2d 1380 (1984).
The father was notified of this action by publication in a newspaper of general circulation in the town of his last known address, Mifflenburg, Pennsylvania. He has never appeared in this action or contested the allegations against him in any way. The mother, in contrast, has consistently and vigorously contested the allegations against her. The Court's finding and conclusions as to each of them are as follows. All findings have been proved by clear and convincing evidence as required by Practice Book 1049 and Santosky v. Kramer, 455 U.S. 745 (1982).
 II.
The case of the father, Carl M., is clear-cut. Joan Means, a social worker with DCYS, credibly testified that she has been assigned to this case since Shana was born. Carl has never visited Shana during the intervening period of almost five years. When contacted by Ms. Means by telephone in a case concerning Shana's sister, Megan, he claimed that he was not Shana's biological father.
With respect to the termination factors enumerated in 17-43a(d), CT Page 2331 the Court finds: (1) that no services have been offered to the father and the child by an agency to facilitate their reunion since the father has at no time expressed the slightest degree of interest in such a reunion; (2) no court orders have been entered into and agreed upon by any individual or agency and the father for the same reason (3) the child has no feelings or emotional ties with respect to her father and has (as will be discussed below) completely bonded with her foster family; (4) the child was born on August 21, 1985; (5) the father has made no effort to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return her (if that would be the word) to his home in the foreseeable future; and (6) the father has not in any way been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the mother or by any other person or by his economic circumstances.
For all of these reasons, the Court finds that Shana has been abandoned by her father in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to her welfare, and terminates all parental rights of the father in Shana.
 III.
This is a case that saddens the heart. As discussed above, Shana M. was born to Patricia M. on August 21, 1985, and was thus some four years and nine months old on the date of the amended Petition. Shana has never known her legal father. Although she has, in contrast, had considerable contact with her mother, she has virtually never lived with her. She has, instead, spent her entire life in foster care. Unsurprisingly, Shana has by now completely bonded with her foster family, and Patricia's (understandable) efforts to assert her own parental rights have (perhaps just as understandably) caused Shana misery, distress, and terror. Although no one can fail to sympathize with Patricia, who has done nothing in recent years that can be described as blameworthy,[3] this Court feels that this situation cannot be allowed to endure.
Shana is the youngest of four children born to Patricia.[4]
Patricia's parental rights in each of the three older children have been terminated by this Court in previous proceedings.[5]
Megan M. was born on July 23 1982. Patricia's parental rights in Megan were terminated by the Hon. John T. Downey on December 13, 1989.[6] Megan is currently in a placement unrelated to the instant case. On December 23, 1983, Patricia gave birth to twins, Brian and Corrina M. On September 17, 1985, Patricia consented to the termination of her parental rights in both of the twins. Both twins were placed with the family of Thomas and Debra M. and, CT Page 2332 subsequently, adopted by that family. That placement is very much relevant to the instant case.
On November 4, 1986, when Shana was fourteen months old, DCYS filed a neglect petition in this Court, pursuant to 46b-129, alleging that Shana was neglected and uncared for within the meaning of 46b-120. The Summary of Facts appended to the Petition avers that after Shana was born she was kept in the hospital for ten days. At the time, Patricia, who was addicted to both drugs and alcohol, had no housing of her own. When Shana was, discharged, she was left in the full-time care of a friend, Lois E. Patricia was, at the time, living elsewhere. This situation lasted for a little over a year — the first year of Shana's life. On October 29, 1986, Patricia requested that Ms. E. bring Shana to a Mrs. Beverly Ann P. to have Mrs. P. assume full-time care for Shana. Shana's stay with Mrs. P. lasted less than a week. On November 2, 1986, Mrs. P. brought Shana to the Hospital of St. Raphael in New Haven for treatment of a fever and diarrhea. The hospital could not reach Patricia for permission to treat, and, Mrs. P. refused to take Shana back. These events led to the neglect Petition being filed and to Shana's long-term removal from Patricia's care and custody.
The Court's findings concerning the events following the. filing of the neglect Petition have been established by documents in the Court's file; by the testimony of Joan Means (who at all, relevant times has been the DCYS worker assigned to this case), i Debra and Thomas M. (Shana's foster parents), Dr. Nancy Millian (a child psychologist who has observed Shana and her mother on a number of occasions), Dr. Ilena Gruenberg (a clinical psychologist who has treated Shana), Patricia M. (the mother), Julia Hamilton (a social worker at Yale-New Haven Hospital who has evaluated Shana for alleged sexual abuse), and Robert B. (a friend with whom Patricia M. resides) and by numerous studies and other documents submitted to the Court as exhibits.
On November 4, 1986 — the date of the neglect Petition — DCYS and Debra and Thomas M. signed a document entitled "Agreement For Temporary Care of Children" (Child's Ex. 1), in which Debra and Thomas agreed to take temporary care of Shana. Patricia testified that she agreed to this arrangement because Debra and Thomas already had custody of Brian and Corrina, and Patricia wanted Shana to be with her siblings if she (Patricia) were to die.
Because of poor health and hospitalization, Patricia did not see Shana for some time. The neglect Petition was granted by agreement on March 19, 1987. According to a journal kept by Debra (State's Ex. J), a visit between Patricia and Shana took place at DCYS in December 1986 and the next visit after that occurred in May 1987. However, beginning in June 1987, visits began to occur CT Page 2333 on a fairly regular basis.[7] The details of these visits have been somewhat disputed, but their general history is fairly clear. The visits, of about one hour in duration, occurred at the DCYS office in Hamden, approximately once per week, although there were occasional cancellations due to illness or inclement weather. Later, Robert B., Patricia's boyfriend, was included in the visits. and the visits were allowed to be unsupervised by DCYS. Eventually, the weekly visits were increased to four hours in duration, and they were allowed to take place in Patricia and Robert's home. This state of affairs continued until November 1989, when the visits were stopped due to allegations of sexual misconduct. The visits resumed briefly in January 1990 but were once again stopped in March, the last visit being on March 8, 1990.
In spite of the fact that the underlying Petition For Termination of Parental Rights was filed on March 23, 1988, these visits were allowed to continue — and, indeed, expand — in the hope that a parent-child relationship might somehow develop out of them. This hope was never realized. The most moving, and persuasive, testimony presented to the Court in this case was that of Debra M. concerning Shana's reaction to these visits. Debra's journal records that even in 1987, Shana would cry and scream when to visit her mother. Such behavior is not, of course, altogether unusual in a two-year-old child, but the distinctive feature of this case is that Shana's strong negative reactions to these visits continued (and, if possible, even worsened) over the years.
Debra M. credibly testified that Shana would become very upset when told that she was scheduled to visit her mother. She would say "I don't want to see her,"[8] go limp, and have to be picked up. Although she did not suffer from carsickness, she would vomit three or four times in the car on the way to a visit. She would try to use Debra as a barrier to protect her from Patricia. After the visits she would be clingy and cranky. She would say, "I hate Pat" and "I don't want to go back and see Pat." In the spring of 1989, Shana began to experience a significant series of night terrors connected with the visits. She would wet and soil her pants and wake up screaming in the night. She i frequently cried and misbehaved. She became, in short, a profoundly unhappy child. Shortly after the visits were suspended in November 1989, she began to behave more normally, slept better, and was a happier child. When the visits were resumed in January 1990, she regressed to her old behavior. She consistently said that she did not want to see Pat. After the visits were once again suspended in March 1990, she eventually became a reasonably happy child again.
Debra's testimony was corroborated by the credible testimony of two psychologists — Nancy K. Millian, who observed Shana and CT Page 2334 Patricia together on a number of occasions between 1988 and 1990; and Ilene Gruenberg, who treated Shana on a number of occasions in 1989 and 1990. Dr. Millian testified that there has been no increase in rapport between Shana and her mother over the years. When Shana was with Patricia she usually played alone. When they interacted, Shana was hostile and withholding. Dr. Millian feels — and the evidence in the case firmly establishes — that Shana has become bonded to her foster family. At this point a mother-child relationship between Shana and Patricia simply cannot be established. Similarly, Dr. Gruenberg testified that there has been a direct relationship between the visits and Shana's numerous anxieties and behavioral difficulties and that there could be no positive benefit from a resumption of visitation.[9]
The tragic nature of this case arises from the fact that the profound distress that Shana has experienced as the result of her visits over the years is more attributable to the unalterable facts of child psychology than to any affirmative wrongdoing (at least in recent years) on the part of Patricia. This can, perhaps, best be seen by a review of the considerations set forth in Conn. Gen. Stat. 17-43a(d).[10]
(1) DCYS has offered services to Patricia to facilitate her reunion with Shana, although these services have, in retrospect, perhaps not been all that Patricia required. DCYS has unquestionably facilitated scores of weekly visits over the years, and until 1989 these visits were allowed to expand from supervised hour-long visits at DCYS offices to unsupervised four-hour visits at Patricia's home. Joan Means, the DYCS worker assigned to this case, testified that DCYS also arranged for Dr. Millian to provide parenting advice to Shana — advice which Patricia desperately wanted and no doubt could have used. Dr. Millian, however, credibly testified that her function was only to "observe" Shana and Patricia interacting together, and whatever parenting advice she gave to Patricia was minimal at best. Whether additional counselling services provided to Patricia at an early date would have changed the course of this case is, of course, unknowable. The best counseling in the world might well have proved ineffectual under these circumstances. In any event, the evidence clearly shows that counseling would make no difference now. The family life of Patricia and Shana is lost beyond recall.
(2) At the time of Shana's commitment by this Court on March 19, 1987, certain expectations were reviewed with Patricia. She was to visit Shana regularly, at least once a week; she was to remain drug and alcohol free; she was to establish housing in her own name; and she was to follow through with medical treatment for her health problems. The evidence in this case indicates that Patricia has met these expectations in every respect. CT Page 2335
(3) The evidence clearly shows that Shana has no positive feelings and emotional ties with respect to her mother. She does not think of her mother as a parent in any psychological sense, and the thought of even a short visit with her mother causes her acute distress and anxiety. On the other hand, Shana has developed significant emotional ties with her foster parents, who have now had her in their care for well over three years (and probably for as long as she can remember) and thinks of her foster parents as her mother and father. See n. 8, supra.
(4) Shana was born on August 21, 1985.
(5) Patricia has made significant efforts to adjust her circumstances, conduct, and conditions to make it in Shana's best interest to return her to her home. As discussed above, she has met all court-ordered expectations. She maintained regular contact and visits with Shana for almost three years until visits were finally stopped (against Patricia's will) in March 1990. Patricia has not, however, maintained regular contact or communication with Shana's foster parents. The reasons for this are perhaps understandable — the evidence suggests that Patricia has consistently viewed the foster parents as rivals for Shana's affection — but this lack of communication has doubtless contributed to a certain lack of understanding on Patricia's part of Shana's anxieties and needs.
(6) Patricia has not been prevented from maintaining a meaningful relationship with Shana by the unreasonable act or conduct of Shana's father or the unreasonable act of any other person or her own economic circumstances. Shana's father has, of course, been out of the picture for years. Patricia has tried mightily to prove that Shana's foster parents have prevented her from maintaining a meaningful relationship with Shana, but the evidence does not support this claim. Debra and Thomas are experienced foster parents and have cared for at least four other children (long since departed) on a temporary basis. They fully recognize their duties as foster parents and have not, as Patricia charges, tried to establish themselves as rivals for Shana's affection. They have, however, been in a unique position to observe Shana's anxieties and strong negative reactions to her visits with Patricia. Seeing that DCYS and this Court were allowing visits to be continued, they did what they could to bring these problems to the attention of responsible people. They made a number of telephone calls to DCYS officials and retained an attorney. Patricia argues that these actions were blameworthy and unreasonable, but the Court does not agree. As Debra M. movingly described her plight to the Court, she had custody of desperately unhappy child who was every week being subjected to visits that she (the child) did not want and could not endure. Debra M. could not responsibly stand by and let this occur without CT Page 2336 letting DCYS officials know what was happening. She never, however, interfered with the visits themselves or in any way tried to poison Shana's mind against Patricia. In following this, course, the Court feels that Debra acted responsibly and not at all unreasonably within the meaning of Conn. Gen. Stat. 17-43a(d)(6). Her acts did not prevent Patricia from maintaining al meaningful relationship with Shana. Such a meaningful relationship was precluded entirely by other factors.
Conn. Gen. Stat. 17-43a(b) provides that this Court may grant a termination petition,
 if it finds upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . over an extended period of time . . . (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
It must be emphasized that the applicability of this condition does not turn on the fault or blameworthiness of the parents. "It is clear that the legislature intended that even without fault on the part of the parent a child should be able to be freed for adoption where there is no ongoing child-parent relationship and where the period of time predictably necessary to establish or I reestablish a parent-child relationship with the natural parent would be detrimental to the child's best interest." In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645, 436 A.2d 290
(1980). Moreover, a somewhat ambiguous early statement by our Supreme Court that "the ultimate question is whether the child has no present memories or feelings for the natural parent", In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875
(1979), must be read in the light of common sense and subsequent case law. See In re James T., 9 Conn. App. 608, 616, 520 A.2d 644, (1987). "[T]he phrase `feelings for the natural parent' refers to feelings of a positive nature. It does not encompass . . . psychologically corrosive and destructive feelings." In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). The existence of such psychologically corrosive and destructive feelings is firmly established by the evidence in this case.
Whatever the reason — whether it evolves from simple personal incompatability or, more likely, the fact that Shana simply cannot CT Page 2337 cope with a threat to her relationship with her foster family — the clear fact is that Shana "hates" Patricia and finds the very thought of meeting with her to be distressing in the extreme. This can hardly be surprising under the circumstances. Patricia has never provided a home for Shana or been her parent in any real sense. The only security that Shana has ever known has been with her foster family. This basic fact will inevitably have a profound effect on her feelings and outlook.
 Unlike adults, who are generally better able to deal with the vagaries of life via reason and intellect, children are governed in much of their functioning by the irrational parts of their minds, i.e., their primitive wishes and impulses. Consequently, they respond to any threat to their emotional security with fantastic anxieties, denial, or distortion of reality, reversal or displacement of feelings — reactions which are no help for coping, but rather put them at the mercy of events. . . . .
 Unlike adults, children have no psychological conception of relationship by blood-tie until quite late in their development. For the biological parents, the facts of having engendered, borne, or given birth to a child produce an understandable sense of preparedness for proprietorship and possessiveness. These considerations carry no weight with children who are emotionally unaware of the events leading to their births. What registers in their minds are the day-to-day interchanges with the adults who take care of them and who, on the strength of these, become the parent figures to whom they are attached.
J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of the Child, 12-13 (2d Ed. 1979). The law cannot fulfill its duty to heed the best interests of the child without being cognizant of, and respecting, these basic facts.
Because of these facts, it is clear that there is, in this case, no ongoing parent-child relationship within the meaning of the statute. The remaining question is whether to allow further time for such a relationship to be established would be detrimental to the best interest of the child. While no one can be insensitive to the plight of a mother who desperately wants to establish some kind of a relationship with her last remaining child, the answer to this question is, as a British judge CT Page 2338 considering similar circumstances has recently observed, "distressingly inevitable." In re K.D., [1988] 1 A.C. 806, 829 (H.L. 1988) (speech of Lord Oliver). Shana is now five years old, and the possibility of her at any time in the foreseeable future establishing a positive relationship with her mother from whom she has effectively been separated since birth is virtually nonexistent. It may be that at some time when Shana is much older — an adolescent or even an adult — she could cope with this situation more effectively "but it is not in the future but in the present that the decision about [her] future must be made." Id. Some years from now — and that is surely the minimum time that would be necessary to overcome the deep fear and hostility present here — it will simply be too late. "It is in the next few years of this little [girl's] life . . . when [her] character will be turned as a result of the emotional relationships which [she has formed] with [her] foster parents . . . and you cannot dig up children in the way that you dig up geraniums; they form emotional roots and these roots have to be preserved intact." Id. at 829-830. (Citation omitted).
One does not need professional qualifications to appreciate how deeply distressing to Shana any further attempt at reunification with her mother will prove to be. An attempt was made for almost three years, and it produced nothing but disaster. Any further attempt would be plainly incompatible with Shana's best interest.
Because the Court has found no ongoing parent-child relationship, it is not necessary to consider the more troublesome allegation of acts of parental commission or omission. Having found the absence of a parent-child relationship, the Court must proceed with the dispositive phase of the litigation. See In re Barbara J., 215 Conn. 31, 47, 574 A.2d 203 (1990). "Proof of one or more of the statutory grounds for termination does not bring forth an order of termination as an automatic result. To warrant a destruction of the parent-child relationship, the Court must also find from clear and convincing evidence that a termination of parental rights is in the best interest of the child." In re Shannon S., 41 Conn. Sup. 145, 161, 562 A.2d 74, aff'd, 19 Conn. App. 20,560 A.2d 993 (1989). In meeting this determination, the Court must consider and make written findings on the six factors enumerated in 17-43a(d). These findings appear earlier in this opinion, and there is no need to repeat them here.
In addition to these facts the Court has also considered the position taken by Shana's attorney — who concludes that "[f]or the sake of Shana's physical and emotional well-being, a termination must take place";[11] and the expert testimony of the psychologists who have examined Shana, Nancy Millian and Ilene Gruenberg, neither of whom see any benefit to Shana in any continuation of CT Page 2339 her mother's parental rights. Of course, the ultimate decision as to the child's best interest must be made by the Court upon a full consideration of all of the evidence. After such a consideration. and on the basis of clear and convincing evidence, the Court concludes that a termination of parental rights is mandated by the best interest standard in this case. It cannot possibly be in Shana's best interest to continue in the (to her) emotionally devastating situation where her mother's parental rights are retained. A termination of Patricia's parental rights will provide the stability for Shana which she so desperately needs.
 IV.
For the foregoing reasons, a termination of the parental rights of Carl and Patricia M. in their minor Child Shana M. is ordered.
As to the father, who has never appeared, the Court orders a notice of its decision to be published in an appropriate Pennsylvania newspaper.[12]
Pursuant to Conn. Gen. Stat. 17-43a(f), it is further ordered that the Commissioner of DCYS be appointed statutory parent so that Shana can be placed in adoption. Pursuant to 17-43(a)(i), the statutory parent shall report to the Court within ninety days on a case plan for the child. It shall then submit reports every six months thereafter until such time as any proposed adoption plan has become finalized.
Dated at New Haven, this 4th day of September, 1990.
Jon C. Blue Judge of the Superior Court